**KEETER TRADING COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 05–243 C.

United States Court of Federal Claims.

Feb. 3, 2009.

614

Christopher O. Carter, Yellville, AR, for plaintiff.

Douglas J. Colton, United States Postal Service, Washington, DC, for defendant.

## OPINION

BUSH, Judge.

This breach of contract case is before the court following a trial held April 23–24, 2008 in Little Rock, Arkansas. Plaintiff asserts that the United States Postal Service's (USPS or Postal Service) decision to terminate plaintiff's contract for default was made in bad faith. Plaintiff contends that it has met its burden of proof for bad faith and is entitled to breach of contract damages in the amount of $42,641.24, plus interest.[1] Based on the evidence presented at trial, and for the reasons that follow, the court concludes that the Postal Service violated the government's duty of good faith performance and defendant therefore acted in bad faith towards plaintiff. Accordingly, plaintiff is entitled to recover breach of contract damages in the amount of $42,641.24, plus interest.

## BACKGROUND

### I. Factual Background

The facts involved in this case were discussed in detail in the court's opinion in *Keeter Trading Co. v. United States,* 79 Fed. Cl. 243 (2007), wherein this court initially ruled on the issue of liability. Only facts relevant to this opinion are repeated herein.

This case centers on the Postal Service's decision to terminate a mail delivery contract it held with a hired carrier in Yellville, Arkansas. On May 31, 2002, USPS entered into Contract Number HCR[2] 72665 (the contract) with Keeter, Inc., (plaintiff, KI), an Arkansas corporation solely owned and operated by Edward L. Keeter.[3] Under the contract, KI was obligated to receive, sort, and deliver mail to 250 residential mailboxes in and around Yellville, Arkansas, at an annual rate of $39,487.92. Contract performance was to commence on July 1, 2002, and to conclude on June 30, 2006. The contract included a Changes Clause which permitted USPS to change KI's duties without plaintiff's consent, so long as the change did not increase plaintiff's compensation rate by more than $2500. Joint Ex. 1 at 54. The Changes Clause provided, in relevant part:

**H.8 CHANGES (TRANSPORTATION)
(Clause B67) (January 1997)**

---

1. By this court's order of February 21, 2008, the parties stipulated to breach of contract damages in the amount of $42,641.24 in the event that plaintiff demonstrated bad faith. Alternatively, the parties agreed that if plaintiff was unable to prove bad faith, plaintiff would only be entitled to termination for convenience damages in the amount of $13,372.88. The issue of attorney fees and expenses was not stipulated by the parties and is not addressed in this opinion.

2. The term "HCR" means Highway Contract Route. *See* Def.'s Ex. 4.

3. Keeter, Inc. later changed its name to Keeter Trading Company, Inc. For ease of reference, throughout this opinion, the court may refer to plaintiff, KI and Mr. Keeter interchangeably.

### a. Service Changes

(1) Minor Service Changes. The contracting officer may, at any time, without consulting the supplier, issue orders directing an extension, curtailment, change in line of travel, revisions of route, or increase or decrease in frequency of service or number of trips and fixing an adjustment in the supplier's compensation which increases the supplier's rate of pay by no more than $2,500. If the supplier believes the increased cost of providing the service required by the order exceeds the increase made in compensation, it may request an adjustment of compensation for the service change.

(2) Other Service Changes. Service changes other than minor service changes, including increases or decreases in compensation, may be made by mutual agreement of the contracting officer and the supplier. Such changes shall be memorialized by formal amendment to the contract.

*Id.*

KI successfully performed the work required by the contract for approximately a year and a half. A dispute arose, however, on December 24, 2003, when USPS's Contracting Officer (CO), Eracio Rodriguez, unilaterally issued a Route Service Order (RSO) which instructed KI to service fifty-two additional mailboxes located along a branch of KI's existing route. According to the RSO, KI was to begin delivering mail to the new boxes on January 24, 2004, and KI's compensation was to increase by $1087.56 per year. Def.'s Ex. 2. This change to plaintiff's duties was memorialized in an order categorized as and titled "Insignificant Minor Service Change." *Id.*

After Mr. Keeter received the RSO, he informed USPS repeatedly that plaintiff did not accept the change because the alterations were not in accordance with the contract.

Pl.'s Facts ¶¶ 9, 12–13. The record shows that Mr. Keeter made verbal statements to that effect to several USPS employees, including contract specialist Jeanette Wofford, and senior contract specialist Mark McCague, both employed in the agency's Dallas, Texas office or Southwest Area Distribution Networks Office (DNO); to the contract's Administrative Official and Yellville Postmaster, Ms. Linda Orr (AO, Postmaster Orr); and to the CO, directly, in late December 2003 and in January 2004.[4] Plaintiff argued that KI would not perform the additional work, primarily because Mr. Keeter believed that the addition of fifty-two mailboxes to KI's route was not a minor service change, but rather fell within the scope of the definition of "Other Service Changes," and therefore could only be accomplished by mutual agreement. Mr. Keeter further argued that because the parties neither negotiated nor attempted to negotiate the proposed changes, KI was not contractually obligated to service the new mailboxes.

Mr. Keeter had contended from the outset that the additional work associated with the new boxes had to be priced according to the formula provided in the contract for "Adjustments for Route Extensions or En Route Boxes." Joint Ex. 1 at 15. That portion of the contract provided, in relevant part, that

> [a]djustments for extensions and en route boxes will be processed using the following formula. Adjustments in the annual hours for casing and route operations will be computed using two constant factors. Multiply the number of additional boxes by 3.64 and the additional miles by 10.40. The sum of the two equals the new hours added to the contract. Adjustments for compensation will be made by the Contracting Officer to the cost worksheet pro-rata.

*Id.* Plaintiff argued that, when analyzed in accordance with this formula, it was clear

---

4. As explained in defendant's brief, the Yellville, Arkansas post office is located within the USPS southwest region. Therefore, the CO in charge of the Yellville post office is based at the Southwest Area Distribution Networks Office (SWDNO or DNO) in Dallas, Texas. Def.'s Post–Trial Brief at 7. The CO works through a staff of contracting specialists at the DNO and the DNO staff is assisted by an Administrative Official (AO), who is "appointed for each contract at the operating facility to which it is assigned, who supervises contract performance under directions from the DNO." *Id.* at 8.

that the additional work at issue warranted more than $2500 per year in additional compensation, as opposed to the $1087.56 being offered by the Postal Service.

As previously stated, the proposed change to plaintiff's contract went into effect on January 24, 2004. From January 24, 2004 through February 20, 2004, the date that Mr. Keeter ceased performance under the contract, KI did not deliver the additional fifty-two boxes. Ms. Wofford and Mr. McCague, the contracting officials, told Mr. Keeter on several occasions that he was contractually obligated to service the additional mailboxes, and that if KI failed to do so, plaintiff might be terminated.

Between January 24, 2004 and February 24, 2004, Mr. Keeter claims that USPS, and more specifically, Postmaster Orr, engaged in tactics designed to intimidate plaintiff into compliance with this unilateral change to his contract. Postmaster Orr wrote Mr. Keeter up on a USPS Form 5500 for every day that plaintiff refused to service the fifty-two mailboxes, as well as for other purported infractions. Mr. Keeter asserts that USPS employees threatened to "dock [his] pay" and "terminate the contract" if plaintiff did not service the fifty-two mailboxes. Pl.'s Post-Trial Brief at 2. Plaintiff contends that USPS representatives, in essence, "insulted and threatened [Mr. Keeter] with financial penalties all because he had the audacity to read and understand his contract and then tell the United States Postal Service they were wrong." *Id.* at 9.

On January 28, 2004, Mr. Keeter participated in a telephone conference with Ms. Wofford and Mr. McCague. Plaintiff attempted to articulate his position, and to explain to the contracting officials that the Postal Service's change was not in accordance with the contract. However, Mr. McCague, according to plaintiff, was not interested in Mr. Keeter's views on the matter: "I was trying to explain my position and I said that [Postmaster Orr] had told me that what I thought didn't matter and Mr. McCague informed me that [Postmaster Orr] was right, that what I thought didn't matter." Tr. at 72 (Keeter). At the end of that tele-phone conversation, Mr. McCague advised plaintiff to put his position in writing.

On January 31, 2004, Mr. Keeter submitted a letter to the CO which expressed plaintiff's complaints about the assignment of additional boxes to his route. At no time, however, did KI provide services to the new mailboxes. Eventually, USPS considered KI's grievance letter, and apparently accepted KI's reasoning regarding the compensation required by the newly assigned boxes. Accordingly, in February 2004, the Postal Service added another $1602.72 per year to the value of the contract. This increase was accomplished through a second "Insignificant Minor Service Change" order which, when added to the first $1087.56 service change amount, resulted in a total of $2,690.28 for the two "Insignificant Minor Service Change" orders. Def.'s Ex. 9. KI, however, continued to refuse to provide services to the additional boxes on the ground that the unilateral change to its duties was impermissible under the terms of the contract's Changes Clause. Eventually, USPS procured these delivery services from Postmaster Orr, and deducted the associated costs from payments otherwise due to KI. When Mr. Keeter learned of the deduction, he informed USPS that KI would no longer perform any work under the contract. On February 20, 2004, KI ceased all performance. Four days later, USPS issued a cure letter to KI which asserted an abandonment of the route and demanded prompt restoration of service. Plaintiff refused to perform. Based on KI's refusal to perform, the CO, on April 28, 2004, issued a decision terminating the contract for default.

## II. Procedural History

Plaintiff filed suit in this court on February 22, 2005. In the subject matter, plaintiff requested that the court review the CO's decision to terminate the contract for default. *Keeter*, 79 Fed.Cl. at 251. Plaintiff also requested that the court review its claim that USPS breached the contract and acted in bad faith. *Id.* In response to plaintiff's allegations, the government filed a motion for summary judgment on March 20, 2007, with plaintiff responding to that motion on April

20, 2007. Defendant's final reply brief was filed on May 5, 2007.

On July 19, 2007, the court denied defendant's motion for summary judgment and held that the government was liable for materially breaching the contract, and wrongfully terminating the contract for default:

> [T]he court concludes that USPS breached the contract when it attempted to unilaterally add fifty-two new boxes to KI's route. That act represented a cardinal change to the contract which was serious enough to justify KI's refusal to perform the work in dispute and its discontinuance of contract performance altogether. Defendant has not carried its burden to show, as a matter of law, that USPS's decision to terminate the contract for default was justified. The United States likewise has failed to prove that the CO's decision to deny KI's certified claims was proper. The government's motion for summary judgment is therefore denied.

*Keeter,* 79 Fed.Cl. at 261–62 (footnotes and citations omitted). However, the court determined that even though plaintiff's allegations of bad faith were serious, the issue of bad faith was not sufficiently developed to decide on the pending summary judgment motions. Thus, the issues of bad faith and damages were stayed pending further factual development by the parties, and the court encouraged the parties to work toward a resolution of those issues in order to negate or limit the scope of any trial proceedings necessary to determine what damages were due to plaintiff.

Although the parties were unable to settle the entirety of the case, they did manage to reach accord on the issue of damages. The parties agreed to termination for convenience damages in the amount of $13,372.88, with interest according to applicable law (if no bad faith were to be found), and breach of contract damages in the amount of $42,641.24, with interest (in the event bad faith were to be evident). The issue of whether USPS was guilty of bad faith in the first instance remained to be resolved by trial. On April 23–24, 2008, trial was held, with post-trial briefing completed on September 9, 2008.

In light of the foregoing discussion, the sole issue remaining before the court is whether USPS representatives acted in bad faith in the termination of Mr. Keeter's contract. In particular, the court will analyze whether USPS representatives in charge of KI's contract acted with a specific intent to deprive plaintiff of its contractual rights. If the court finds that USPS representatives did intend to deprive plaintiff of its contractual rights, then it will be the court's determination that the government agency violated its duty of good faith and fair dealing and acted in bad faith.

## DISCUSSION

### I. Standard of Proof for Bad Faith

■ The United States Court of Appeals for the Federal Circuit has defined the covenant of good faith and fair dealing as "an implied duty that each party to a contract owes to its contracting partner." *Centex Corp. v. United States,* 395 F.3d 1283, 1304 (Fed.Cir.2005). "The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* The covenant applies to both government and private parties. *Id.*

■ When a contractor alleges bad faith, or breach of the covenant of good faith and fair dealing, a contractor must overcome the "strong presumption that government contract officials exercise their duties in good faith." *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1239 (Fed.Cir. 2002) (citing *Knotts v. United States,* 128 Ct.Cl. 489, 492, 121 F.Supp. 630 (1954)); *Spezzaferro v. FAA,* 807 F.2d 169, 173 (Fed. Cir.1986) ("Government officials are presumed to carry out their duties in good faith."); *see also Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1301 (1976); *Librach v. United States,* 147 Ct.Cl. 605 (1959).

■ To rebut that presumption, the contractor must establish by "well nigh irrefragable proof" that the government acted in bad faith. *Kalvar,* 543 F.2d at 1302; *Torn-*

*cello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 770 (1982). Stated more plainly, a plaintiff is required to raise "clear and convincing" evidence of improper motive on the part of the government. *Am–Pro,* 281 F.3d at 1239; *see also North Star Alaska Hous. Corp. v. United States,* 76 Fed.Cl. 158, 187 (2007); *Libertatia Assocs., Inc. v. United States,* 46 Fed.Cl. 702, 706 (2000) (describing the standard as "clear and strong evidence" of "specific acts of bad faith" by the government) (citations omitted). This standard, while somewhat daunting, "is not intended to be impenetrable ... [and] does not 'insulate government action from *any* review by courts.' " *North Star,* 76 Fed.Cl. at 188 (citations omitted). Instead, the relevant question is whether the plaintiff has presented evidence that the government had a specific intent to injure the contractor, or was motivated by animus toward the plaintiff. *North Star,* 76 Fed.Cl. at 187; *Libertatia,* 46 Fed. Cl. at 707; *Norwood Mfg., Inc. v. United States,* 21 Cl.Ct. 300, 309 (1990), *aff'd,* 930 F.2d 38, 1991 WL 31958 (Fed.Cir.1991) (table). Indeed, the concept of "bad faith" has traditionally been equated with "actions motivated by malice or the specific intent to injure." *SMS Data Prods. Group, Inc. v. United States,* 19 Cl.Ct. 612, 617 (1990) (citing *Kalvar,* 543 F.2d at 1302; *Knotts,* 121 F.Supp. at 630–31).

 It is important to recognize, however, that a plaintiff need not show that each and every action alleged to be harmful "was independently animated by animus." *North Star,* 76 Fed.Cl. at 189. To the contrary, "[c]ourts have found bad faith when confronted by a course of government conduct that was 'designedly oppressive,' or that 'initiated a conspiracy' to 'get rid' of a contractor." *Id.* at 187–88 (quoting *Struck Constr. Co. v. United States,* 96 Ct.Cl. 186, 222 (1942); *Knotts,* 121 F.Supp. at 636). The covenant of good faith and fair dealing inherent in any contractual relationship may likewise be breached "if, in ways unenvisioned by the contract, a party proceeds in a fashion calculated to frustrate or hinder performance by

its contracting partner." *Id.* at 188. This type of violation may occur even in the absence of a separate breach of express contractual terms. *Id.*

## II. Evidence of Bad Faith by the Administrative Official

Plaintiff argues that although the AO did not have the "authority to negotiate, amend, revise, [or] terminate" the contract, she was the "mastermind" behind the change made to KI's contract, and the wrongful default termination of the contractor. Pl.'s Post–Trial Reply Br. at 3. Defendant, on the other hand, is adamant that Postmaster Orr's actions toward Mr. Keeter were not contrary to her duties as an AO, and thus were not in bad faith:

> The Contracting Officer testified that the actions and decisions of Orr concerning Keeter were proper and authorized. He said that the conduct of Orr that plaintiff alleges shows malice towards him (and favoring Hoover) was appropriate performance of AO duties, specifically including: recommending route modifications, requesting termination of plaintiffs' [sic] Contract, and preparing Forms 5500 and records of her costs when she carried the [fifty-two mailboxes] herself. These were actions that as CO he expected from an Administrative Official. No evidence supports existence of the improper motives that plaintiff attributes to Orr.

Def.'s Post–Trial Br. at 20 (citations omitted).[5]

In reviewing the trial testimony and documentary evidence, the court finds plaintiff's allegations, largely, to be true. Although the court would not necessarily characterize Postmaster Orr as a "mastermind" behind the change to KI's contract and its termination, Postmaster Orr worked in concert with Mr. Rodriguez, Mr. Wofford and Mr. McCague, the contracting officials, convincing them to make a unilateral change to KI's contract. The court finds that while Postmaster Orr orchestrated the proposed change to KI's contract, she did not authorize

---

5. Duane Hoover, like Edward Keeter, was a contract carrier for the Postal Service and also worked out of the Yellville Post Office. All future references to "Hoover" or to "Mr. Hoover" will be to Duane Hoover.

the amendment or termination of KI's contract. However, it was Postmaster Orr's representations and recommendations which set in motion the Postal Service's actions depriving KI of its contractual rights and resulting in the wrongful default termination of the contractor.

## A. The Administrative Official Recommends a Change to Plaintiff's Contract Route

In its post-trial brief, plaintiff asserts that Postmaster Orr acted in bad faith because the change to KI's route was made "to benefit Hoover to the detriment of Keeter." Pl.'s Post–Trial Br. at 6. Plaintiff argues that Postmaster Orr justified the change to KI's contract by asserting that Keeter was being compensated for more time than was required for his original route. Plaintiff further contends that the AO consulted with Duane Hoover about the proposed change to KI's route, but failed to consult with Mr. Keeter. Defendant has a different view of the facts. Defendant argues that the change in KI's route was not implemented to harm Mr. Keeter, but to "accomplish [ ] defendant's responsibility to deliver the mail." Def.'s Post–Trial Br. at 12. Defendant asserts that the change to KI's route came about when Postmaster Orr "realized that the schedule for Hoover's allowed insufficient time for morning 'casing' of the mail in preparation for its delivery." [6] *Id.*

Some background facts aid in the understanding of this dispute. Duane Hoover's brother, Steve Hoover, had a large postal route which was divided into two routes in the summer of 2002, with KI bidding on and winning one route, and Duane Hoover bidding on and winning the other. Tr. at 12 (Hoover), 132(Orr). These postal routes were rural routes in which the delivery person generally would drive up to the mailboxes and put the mail in the box without exiting the vehicle. Tr. at 15 (Hoover). The route that Mr. Hoover won had approximately 320

boxes while KI's route consisted of approximately 250 boxes (116 boxes in Yellville, AR, and 133 boxes in Peel, AR). Pl.'s Ex. 1; Tr. at 13 (Hoover), 56, 63–64 (Keeter). Mr. Keeter had been selective in choosing which route to bid on and, in fact, had spoken with Postmaster Orr prior to bidding on the route that he ultimately won, indicating to her that he had chosen to bid on that particular route "because of the number of boxes and I could also get done early in the day and I had a real estate license, I could do something else in the afternoon." Tr. at 61 (Keeter); Def.'s Ex. 7 at 1.

Eventually, Mr. Hoover complained to the AO that he needed more time for casing. Tr. at 12 (Hoover). Mr. Hoover's route provided one hour for casing but Mr. Hoover felt that he needed approximately an hour and forty-five minutes to case the mail. In response to Mr. Hoover's complaint, Postmaster Orr added half an hour for casing time to Mr. Hoover's route and as a result, Mr. Hoover received an increase in compensation for the thirty minutes. Tr. at 16 (Hoover). Not long thereafter, Postmaster Orr determined that she wanted to make more changes to Mr. Hoover's route. Postmaster Orr offered Mr. Hoover an auxiliary route known as the Flippin route. In taking on the Flippin route, Mr. Hoover would gain an additional forty boxes along with additional mileage. Postmaster Orr also "personally noted that Keeter regularly had extra time during the period covered by his schedule, while Hoover was constantly busy and possibly overloaded." Def.'s Post–Trial Br. at 13; Tr. at 136–37(Orr). Based on her observations, Postmaster Orr "decided that the best, and least expensive [ ] way to address this concern would be to transfer responsibility for a group of boxes, located along a road segment traveled by both suppliers, from Hoover's route to Keeter's." Def.'s Post–Trial Br. at 13.

---

**6.** Casing was defined as putting the mail in a sequential order prior to delivery. More specifically, casing was described as follows:

> Generally, there's three containers and each one of them has six rows on it. Within that six rows are slots and underneath the slot are labels and on the labels are the addresses. And you put them all in order and then you pull your last person on the route first and build up bundles.

Tr. at 12–13 (Hoover).

The AO, in consultation with Duane Hoover, arranged to have Mr. Hoover divide up a twelve mile stretch of his route. This twelve mile stretch physically overlapped with KI's route, such that from the location of the Yellville post office, they both had to travel Highway 14 North, passing through the same stretch of highway in making their respective mail deliveries. Tr. at 20 (Hoover). There were approximately 100 boxes on that part of the route. *Id.* The AO instructed Mr. Hoover to determine the "most logical place and box group to split from his route and transfer to Keeter's without transferring mileage." Def.'s Post–Trial Br. at 13; Tr. at 19–21 (Hoover). Mr. Hoover followed the AO's instructions, and proposed the transfer of fifty-two boxes with no additional mileage to KI's route. Tr. at 21 (Hoover). This maneuver, along with the Flippin change, resulted in a net loss of twelve boxes for Mr. Hoover with a gain of mileage.

These proposed changes significantly increased the value of Mr. Hoover's contract and, in effect, lowered the value of KI's contract. As explained in the court's initial opinion in *Keeter,* the contract formula controlled how much money flowed from route changes and, in accordance with that formula, it was clearly far more profitable to be awarded increased mileage as opposed to more boxes. *Keeter,* 79 Fed.Cl. at 255 ("Adjustments in the annual hours for casing and route operations will be computed using two constant factors. Multiply the number of additional boxes by 3.64 and the additional miles by 10.40. The sum of the two equals the new hours added to the contract."). According to USPS, the proposed changes increased the value of Mr. Hoover's contract by approximately $2,030.85. Tr. at 23 (Hoover). On the other hand, with KI gaining fifty-two boxes with zero mileage pursuant to Postmaster Orr's directions, Mr. Keeter was informed that only $1,087.56 would be added to his contract as a result of these changes. *Keeter,* 79 Fed.Cl. at 255.

Postmaster Orr testified that she believed that the changes to the route schedules were necessary because Mr. Hoover was getting overburdened on his route and so she felt that she needed to lighten his load. Tr. at 136–37(Orr). In reaching the particular solution that she proposed to the DNO, the AO stated that her objectives were as follows: (1) to lessen the number of boxes on Duane Hoover's route; (2) to get rid of the route delivery lady from Flippin; and (3) to accomplish these changes in the cheapest way possible. Tr. at 149(Orr).

While the Postmaster's articulated reasons for the proposed changes may have appeared on the surface to have been legitimate, there remained troubling and in some instances, unjustifiable aspects of the AO's actions in carrying out these stated objectives. First, although Postmaster Orr testified that Mr. Hoover was overburdened in both boxes and miles, the changes that she orchestrated (in consultation with Mr. Hoover to the exclusion of Mr. Keeter), bestowed miles upon Hoover and boxes upon Keeter, resulting in a financial gain for Hoover, while penalizing Keeter. Additionally, although Postmaster Orr testified that her changes were not made for the purpose of helping Mr. Hoover, Tr. at 177, 186(Orr), her actions appeared to contradict that testimony, inasmuch as she wrote an e-mail to Ms. Wofford relaying a financial concern pertaining to Mr. Hoover. Def.'s Ex. 24. Finally, the record reflects that the AO's justification for the changes (that plaintiff had extra time in his schedule to service the additional fifty-two boxes) was unsupported. These flaws in the Postmaster Orr's reasoning and actions will be discussed in more detail, *infra.*

Postmaster Orr, as the record reflects, mentioned the proposed change affecting KI's route to Mr. Keeter on December 1, 2003. Tr. at 63 (Keeter). Mr. Keeter responded that he did not accept the change because it was implemented to "appease Duane Hoover." *Id.* The AO responded that "it didn't matter what [he] thought." *Id.* Immediately after that conversation, Mr. Keeter contacted the contracting specialist, Ms. Wofford, in Dallas, who responded that "it was a done deal." Tr. at 65 (Keeter). A few weeks later, on December 23, 2003, a change order was issued.

The testimony demonstrates that the change to KI's route happened relatively quickly and without any input from Mr.

Keeter. By the time Mr. Keeter was informed about the change to his route, it had already been approved by the DNO. Mr. Hoover, on the other hand, was actively involved in the changes to his route. The AO, working in concert with Mr. Hoover, changed Mr. Hoover's route in the manner he suggested. The record supports plaintiff's assertions that the AO's change to KI's route was to benefit Duane Hoover. When asked the reasons for changing the route, the AO's immediate response was that Duane Hoover "was getting overburdened on his route." Tr. at 136(Orr). After observing that Mr. Hoover was overburdened with "too much mail" and "too many miles," Postmaster Orr began corresponding with Ms. Wofford at the DNO about changing the route. In one of her e-mails to Ms. Wofford, the AO showed concern as to whether Mr. Hoover would get more money under the proposed changes:

> No problem, but does it mean more money to [Hoover]? I think that is his big complaint. Otherwise, I just change the schedule by adding more time for casing, not changing the run time, and submit to you?

Def.'s Ex. 24. Postmaster Orr then addressed this concern by decreasing Duane Hoover's boxes and adding more miles to his route which meant more money for Mr. Hoover, while adding more boxes with no mileage to Mr. Keeter's route. Tr. at 21, 28 (Hoover). As reflected by Mr. Hoover's testimony, additional mileage increased Mr. Hoover's contract by $2030.85:

> Q. So in essence, you gained 40 boxes, lost 52, for a loss of 12 boxes. But you gained mileage, is that correct?
>
> A. Correct.
>
> Q. And for Duane Hoover, was that a good thing, a bad thing?
>
> A. It was a good thing because I was paid compensation for the extra mileage.
>
> . . . .
>
> Q. The proposal with regard to the changes for you would increase your

contract by about $2030.85, does that sound about right?

> A. Sounds about right.

Tr. at 22–23 (Hoover). Clearly, Postmaster Orr went to extensive lengths to make certain that Duane Hoover was happy. Not only did Mr. Hoover get fewer mailboxes, but he also got a significant pay increase.[7] In light of the foregoing, it is clear that Postmaster Orr's proposed change to KI's route was made in large part to financially benefit Duane Hoover and did so to a significant extent.

Additionally, the court finds that the AO did not have a reasonable basis to support her contention that plaintiff had "extra time" within his schedule to service the fifty-two boxes. In her recommendations to the DNO, the AO insisted that Mr. Keeter should have no extra time added to his contract because plaintiff did not even utilize the entire one hour and fifteen minutes allowed for casing the mail. In the document proposing the changes, Postmaster Orr explained that:

> Supplier does not use 1:15 [one hour and fifteen minutes] morning casing time. Presently, 45 [minutes are] used. Driver is currently allowed 1 [hour] to drive from Summit to Peel. He leaves Yellville early and arrives at Peel between 8:30[and] 9:00[am]. Extra time allowance is not necessary for him to meet the Peel dispatch time.

Def.'s Ex. 1 at 5.

In his grievance letter to the post office, Mr. Keeter disputed the AO's assertion that there was excess time in his route, stating that:

> I would like to discuss this time factor. Linda Orr is saying that I am being allowed from 8:30 to 9:30 to get from Summit to Peel and it doesn't take that long. It doesn't but why does it matter? I am a contractor. I am not an hourly employee. I am getting paid to perform a task with my own expenses. I end up putting in my 6.5 hours anyway. The contract only allows 25 minutes to sort the mail at Peel

---

7. Plaintiff, on the other hand, would have suffered a financial detriment as a result of the change to KI's route. Relying on the AO's statements, the DNO concluded that the additional fifty-two boxes would increase Mr. Keeter's work by only 76 hours per year (15 minutes a day), at a value of $1087.56. Def.'s Post–Trial Br. at 18; Tr. at 243 (Wofford).

which is not accurate. It takes much longer than that. Something else I learned to do is to take Summit's mail up with a separate trip and then come back to Yellville to load Peel's mail. I do this at my own expense. I do this to get Yvonne Cackley's mail to her as soon as I can so she won't have to wait on me to start sorting it. She is the Postmaster at Summit. This also allows me to gain some time so I could drive straight through to Peel. I never dreamed this would be used against me.

Def.'s Ex. 7; Tr. at 100 (Keeter). Mr. Keeter testified that when he submitted this grievance letter to the post office, he attached several weeks of time sheets to the letter, asking that the contracting officials show him "where all this extra time was." Tr. at 100 (Keeter). The contracting officials never responded to that request, and there was never an actual study or inquiry made by the AO or anyone else at USPS to ascertain whether plaintiff actually had extra time in his schedule.

In fact, the AO failed to observe that plaintiff might have appeared to have had "extra time" because he did not socialize or take smoking breaks. There was undisputed testimony at trial that reflected that Mr. Keeter was a person who came into the post office and worked straight through, doing his work efficiently, without taking the smoking breaks that the rest of the carriers took, and without spending time socializing with other employees. Tommy Carl Griffin, a USPS rural carrier, testified that Mr. Keeter did not take breaks during casing:

Q. Did people take breaks during the casing?

A. Yes.

Q. Did Mr. Keeter take breaks?

A. No.

. . . .

Q. Would it be fair to say virtually everybody who was doing casing or working there smoked?

A. All the rural carriers and contract carriers with the exception of Ed, I think all smoked. And we'd pretty much all go out at the same time.

Tr. at 42 (Griffin). Even Mr. Hoover testified that plaintiff did not smoke, or socialize with other carriers: "[H]e showed up and did his casing and left." Tr. at 31 (Hoover).

The court also finds that Postmaster Orr's own casing and delivery efforts contradict her assertion that plaintiff had extra time to service the additional fifty-two boxes. The record shows that when plaintiff refused to service the fifty-two boxes, the AO billed over an hour to perform the same work that she had told plaintiff would only take ten minutes a day. In his grievance letter, plaintiff apprised the DNO that Postmaster Orr charged $95 a day for approximately an hour to deliver the fifty-two boxes when defendant had offered plaintiff $3.59 a day to deliver the same boxes:

Linda tells me that those 52 extra boxes wouldn't take me over 10 minutes extra a day.... The average time she is trying to get me to pay her for the past five days is 1 hour and 21 minutes. This is considerably more than 10 minutes. It is interesting that she is charging me as much as $95.33 for something she expects me to do for $3.59. I realize she is figuring in her time to get there and back but still it is easy to see that I would not be getting to Peel anywhere near 8:30 with the extra boxes. She is trying to increase my box count by about 20% at the same time not take into consideration the extra time it would take.

Def.'s Ex. 7; see also Tr. at 76 (Keeter); Pl.'s Ex. 3 (showing that the AO was billing more than an hour to deliver the fifty-two boxes). When asked why she required more money for servicing the fifty-two boxes, Postmaster Orr testified that she needed the extra time since she had to get to the boxes and return to the post office as opposed to plaintiff already being out there, and she was slower at casing than plaintiff. Tr. at 183(Orr).

The court is mindful that it could have taken Postmaster Orr more time than plaintiff to case the fifty-two boxes because casing was not part of her regular postal duties. However, the court believes that there is a major discrepancy between the ten minutes that plaintiff was allowed for servicing the fifty-two boxes, and the hour plus that Post-

master Orr charged to perform the same work. In this court's opinion, a reasonable amount of time for plaintiff or the AO to service the fifty-two boxes lies somewhere between ten minutes and an hour. In any event, it is the court's view that plaintiff did not have the extra time that Postmaster Orr indicated was available in Mr. Keeter's schedule for servicing the disputed boxes and had Postmaster Orr reasonably carried out her duties by inquiring into KI's schedule, she would have discovered that fact. Moreover, the issue of extra time in KI's route appears to be a pretextual rationale for changing KI's route, a rationale that is not supported by the record. *See infra.*

## B. The Administrative Official Puts Pressure on Plaintiff to Comply with the Change to Its Contract

After the change to KI's contract went into effect, Mr. Keeter insisted that he would not service the additional fifty-boxes because the change was not in accordance with his contract. To force plaintiff into compliance with the new contract amendment, Mr. Keeter asserts that USPS representatives intimidated and threatened plaintiff with financial penalties. In particular, plaintiff asserts that Postmaster Orr wrote Mr. Keeter up on a USPS Form 5500 every day for nondelivery of the fifty-two boxes and also wrote plaintiff up for arriving and leaving earlier than his scheduled time. Pl.'s Facts ¶ 20. Plaintiff also contends that the AO exhibited bad faith when she asked the DNO on at least three different occasions to terminate KI's contract.

According to defendant, the 5500 forms were not intended to harm Mr. Keeter. Defendant contends that the 5500s "are standard Postal Service Forms used in contract administration, and preparation of them is an AO duty." Def.'s Post–Trial Br. at 20. Defendant contends that the AO "prepared and processed the 5500s" in the manner directed by the USPS. *Id.* at 20 n. 8; *see also* Def.'s Ex. 4B at 13 (Highway Contract Routes—Box Delivery Service (P–5 Handbook)) (stating that the AO is required to "[r]eport any serious operating failures promptly to the local distribution networks office for the area and immediately issue a PS Form 5500, Contract Route Irregularity Report").

While the issuance of 5500 forms may have been a part of the AO's postal duties, the court is not persuaded that the AO, in this case, used the 5500 forms in a completely appropriate manner. Evidence shows that between January 24, 2004 and February 20, 2004, the AO wrote plaintiff up twenty-five times for failure to deliver the fifty-two boxes. Pl.'s Ex. 4. The evidence also shows that during the same period, the AO wrote KI up for "failure to observe contract schedule," because plaintiff was arriving and leaving the post office earlier than the scheduled contract time. *Id.* Although it may have been appropriate for the AO to write KI up for non-delivery of the fifty-two boxes, the court sees no basis for the AO writing plaintiff up for "failure to observe contract schedule." The record shows that plaintiff had been arriving early and leaving early for nearly a year and a half, specifically, from the commencement of KI's contract on July 1, 2002 through December 24, 2003, the date that the change order was issued. During that period, there is no evidence of the AO ever reprimanding Mr. Keeter for non-compliance with his contract schedule. Indeed, the undisputed testimony shows that the AO did not previously have any concerns in that regard.

Additionally, Mr. Keeter testified that the existing policy at the Yellville post office was that carriers could leave before their appointed contract schedule time if the weekly Baxter Bulletin newspaper had arrived. If the Baxter Bulletin had not arrived by 8:00 a.m., the carriers were free to leave after that time. Postmaster Orr confirmed that this policy existed, and that plaintiff had been permitted to leave early under the conditions of this policy:

Q. Did he occasionally leave before his designated leaving time?

A. Only if the newspapers that y'all talked about earlier were there.

Q. Did he ever leave the newspapers behind?

A. If they came in after 8:00, he was told it was all right.

Tr. at 179(Orr). Thus, the AO did not begin to write plaintiff up until the fifty-two boxes became an issue. At trial, it became apparent that the AO had to struggle to come up with reasons to justify writing Mr. Keeter up for leaving early.[8] One reason cited by the AO was that plaintiff's variation from his schedule meant that people could not get their mail at the same time each day, and that was a "kind of Postal Service policy...." Tr. at 186(Orr). Another concern expressed by the AO was that people "can't be sure that any mail they put out is going to get picked up that day if the carrier has already been there." Tr. at 187(Orr). The AO did not cite to any specific postal policy or regulation to support her statement. More importantly, the time variances between when plaintiff was scheduled to depart and his actual early departures were so small as to render Postmaster Orr's objections warrantless.

The AO's concerns regarding plaintiff's varying departure times are belied by the fact that the CO, Mr. Rodriguez, stated that there was nothing wrong with a supplier with Mr. Keeter's type of contract arriving early, getting his work done, and leaving early:

> Q. Is there anything in the type of contract that Mr. Keeter has that would preclude the supplier from coming in-getting his work done early, coming in early and getting his work done early?
>
> A. No.

Tr. at 381 (Rodriguez). The CO testified that the only problem that he could envision in those circumstances would be wide variations in the time that the mail was delivered each day. Tr. at 383–84 (Rodriguez). When asked by the court whether a short time-frame variation would be considered a problem to the Postal Service, the CO responded that it would not:

> Q. Timel[iness], but are you using that to say I'm a Postal Service customer and I expect to get my mail at 2:00 every afternoon and if it gets there at 1:00, that's not acceptable or if it gets there at 12:30?

> A. Well, in that short time frame, no; but if normally you get your mail at 10:00 in the morning and you're now getting it at 4:00, there's a problem. Why is that? So we have to maintain some reasonability of that mail.
>
> ....
>
> Q. So if there were wide differences, that would be a problem?
>
> A. Yes, ma'am.

Tr. at 383 (Rodriguez).

The CO's answers to these hypotheticals squarely address the present case. For example, the record shows that the AO wrote plaintiff up on January 28, 2004 for leaving at 7:55 a.m. instead of the scheduled departure time of 8:15 a.m. Pl.'s Ex. 4C. On January 30, 2004, plaintiff was written up for leaving at 8:00 a.m. instead of the scheduled departure time of 8:15 a.m. Pl.'s Ex. 4G. Similarly, on January 31, 2004, plaintiff was written up for leaving at 8:00 a.m. instead of the scheduled departure time of 8:15 a.m. Pl.'s Ex. 4H. Postmaster Orr wrote plaintiff up twenty times for leaving early, and the difference in time between plaintiff's actual departure time and his scheduled departure time varied between fifteen to twenty minutes. The court finds that plaintiff's departure fifteen or twenty minutes before the scheduled time is not a sufficiently wide variation as to constitute a material violation of the contract, or any postal service policy. The CO's analysis, as shown above, clearly supports the court's view that the AO was unreasonable in this regard. Consequently, the court concludes that the AO was not acting in good faith by continuously writing plaintiff up for arriving early and leaving early.

Similarly, the court finds that the AO acted in bad faith in an attempt to deprive plaintiff of the reasonable expectations of its contract when she asked the DNO on three separate occasions, February 2, February 6 and February 9, 2004, to terminate Mr. Keeter for his refusal to service the fifty-two boxes. *See* Pl.'s Exs. 9, 10, 13. These requests demonstrate that the AO wanted plaintiff's contract terminated because Mr. Keeter refused to capitulate to her demands.

---

8. Objections to plaintiff's early arrivals were never explained.

There is also testimony by another carrier, Mr. Griffin, to that effect:

Q. Okay. Well, specifically Linda Orr, the postmaster, do you remember any comments she made?

A. It seems like one day I remember I was there and she was not happy about something and it turned out, later I found out it was about Ed not carrying the boxes. I can't remember word for word, but she made some comment of he's going to carry those boxes or I'll fire him or he's going to get fired or something similar to that.

Tr. at 44 (Griffin). Although the DNO had the final authority to terminate Mr. Keeter, the testimony at trial showed that the AO's repeated requests for termination exerted significant influence and pressure on the DNO to end KI's contract.

Based on the foregoing, the court concludes that although the AO did not have the contractual authority to terminate plaintiff's contract, Postmaster Orr's representations and actions were sufficient overall and played a key role in convincing the contracting officials to terminate KI's contract. Postmaster Orr contrived to deprive Mr. Keeter of his reasonable expectations under the contract. In these actions, the court sees an obvious violation of the duty of good faith and fair dealing on the part of the USPS.

### III. Evidence of Bad Faith by the Contracting Officials[9]

Several times in defendant's brief, the government argues the AO has no contractual authority, and that she was not allowed to "interpret [contract terms] independently of directions from the DNO." Def.'s Post–Trial Br. at 18. Defendant insists that the AO's job was merely "to oversee suppliers in order to obtain reliable performance of their contracts, under direction by the DNO." *Id.* Although defendant makes this assertion, the record is replete with evidence that the DNO relied almost exclusively on the AO to make its final decision regarding plaintiff's default termination. The evidence adduced at the

trial strongly demonstrates that Ms. Wofford, Mr. McCague and Mr. Rodriguez, the USPS contracting officials, relied on the AO's representations with an obvious disregard of the contractual provisions set forth in KI's contract. *See North Star*, 76 Fed.Cl. at 209 ("[I]n consulting with others, a contracting officer may not forsake his duties, but rather must ensure that his decisions are the product of his personal and independent judgment."); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed.Cl. 421, 427 (2002) (holding that the contracting officer relied on the recommendation of the technical evaluation board and failed to conduct an independent and informed decision). In collaborating with the AO, and failing to exercise an independent and informed judgment, the contracting officials violated the government's duty of good faith performance, and thus acted in bad faith in the administration of the contract at issue.

In reaching its determination that the contracting officials acted in bad faith, the court relies on *Struck Construction Co. v. United States*, 96 Ct.Cl. 186 (1942). In that case, the court held that the "test of good faith should be the same for an entity which must act through agents as for an individual acting for himself." *Id.* at 221. In succinct terms, the *Struck* court described the standard as follows:

If the aggregate of the actions of all the agents would, if all done by one individual, fall below the standard of good faith, the entity for whom the various agents acted should be held to have violated that standard. It is the responsibility of the entity, the principal, to so coordinate the work of its agents that the aggregate of their actions will conform to required legal standards.

*Id.* By adopting the *Struck* standard, the court finds that USPS, as a government agency, violated the implied duty of good faith and fair dealing by intentionally depriving plaintiff of its bargained-for rights under the contract.

---

9. In this opinion, the court refers to Ms. Wofford, Mr. McCague and Mr. Rodriguez, collectively, as the "contracting officials."

## A. Ms. Jeanette Wofford

Ms. Wofford was the contract specialist assigned to plaintiff's contract during these events. Ms. Wofford, who began her employment with USPS in 1980, became a Transportation Networks Specialist in 1992, and then a contract specialist in 1998.

As previously stated, it is apparent that the contracting officials relied heavily on the AO's representations without exercising their own independent judgment regarding plaintiff's situation. The court finds compelling evidence in the record which shows that Ms. Wofford deferred to the AO at all times rather than making her own decisions regarding plaintiff's situation. For example, in a file memo dated January 2, 2004, Ms. Wofford writes that plaintiff called her stating that KI would not deliver the additional fifty-two boxes because the change represented a 20% increase in his work volume for only $3.00 more per day. Def.'s Ex. 13. Plaintiff explained to Ms. Wofford that the reason that "he had originally bid on the route was because he could do his other business and still make delivery on the route." *Id.* Mr. Keeter asked Ms. Wofford to call the AO and let her know that plaintiff did not accept the change and that he was not going to deliver the boxes. *Id.* Ms. Wofford states in the memo that "I told him NO, that I was not getting involved in telling her that. I reminded him that she was his boss and she felt that the change was in the best interest of the Postal Service." *Id.*

Instead of Ms. Wofford addressing plaintiff's contractual problem, she instructs plaintiff to comply with the AO's instructions. Ms. Wofford was mistaken in her advice to plaintiff, and in violation of the contract terms that stated:

> The Administrative Official for your route is the Postmaster in Yellville, AR.... You may also contact Jeanette Wofford at.... Please be aware that there is a difference between contracting and supervisory authority of which you must be aware. Only the Contracting Officer or a representative from this office has the authority to authorize changes to your contract.

Def.'s Ex. 12. Here, we have Mr. Keeter complying with the contract terms, and contacting the correct authority, Ms. Wofford, for assistance. Ms. Wofford, in turn, sends plaintiff back to the AO whom the contract explicitly states does not have the contractual authority to deal with Mr. Keeter's problem.

Compounding her failure to address plaintiff's concerns is evidence in the record that shows Ms. Wofford was confused about the AO's changes to Mr. Hoover's and KI's routes. Ms. Wofford, however, did not conduct an independent inquiry into the changes, but instead relied on the AO to dispel her confusion. An e-mail dated February 10, 2004, sent by Ms. Wofford to the AO, illustrates this point:

> The attachment is not legible (please mail).
>
> Please use the HCR# INSTEAD of HC62, etc. AND RESEND TO ME FOR MY FILES. I need to get all information so I can explain what happened to what route, etc.
>
> 1) The 52 boxes HCR 72665 GAINED: are they before Peel or after? (were the boxes out of Yellville or Peel?) Will this still put him in Peel 30 minutes early?
>
> 2) The route that lost 12 boxes and gained 11 miles: You state 52 boxes came from this route, but show he lost 12 boxes? He must have gained boxes from some route?
>
> 3) What territory did the one route lose that gave 52 boxes to HRC 72665? When in-line boxes come up what boundaries will be for 72665 and what boundaries for the other route since they both travel the same line of travel?
>
> 4) Please send me a marked up map for the 2 routes in question. The ones you sent were on 2 separate sheets and not too good for future use. I need to see the before and after for Hoover's route, AND the before and after for HCR 72665.

Def.'s Ex. 10. Ms. Wofford followed up with another e-mail to Postmaster Orr on the same day seeking further clarification: "Why were 11 miles added to Mr. Hoover's route? Are there any boxes within that 11 mile radius? Please indicate on map you will be sending me where those 11 miles begin and end." *Id.*

Despite Ms. Wofford's confusion, or perhaps because of it, she continued to defer to

the AO for guidance with the route changes. The record shows that Ms. Wofford relied on the AO to calculate plaintiff's compensation for the additional fifty-two boxes. Mr. Keeter's contract, as previously stated, contained a formula which was required to be applied by defendant in calculating plaintiff's compensation for the additional fifty-two boxes. Ms. Wofford testified that the formula was the same for every contract like Mr. Keeter's, Tr. at 208, but she did not apply the formula in this case because the AO had told her that no additional time was needed for plaintiff:

> Q. Ms. Wofford, why—or was this formula [not] applied to Mr. Keeter in December of 2003?
>
> A. It was not applied because I was told that he already had the additional time and no additional time was needed, because in his route there was too much time in the route for his travel between Summit and Peel. It only took him 30 minutes and he had over an hour in there, which he had been paid for.
>
> Q. And who told you that?
>
> A. When I talked to the postmaster.

Tr. at 209–10 (Wofford).

Ms. Wofford testified that she also did not apply the formula because of a post office policy entitled "Policy on Additional Enroute Boxes," which she contends stated that the contract formula was not mandatory. Tr. at 230 (Wofford); Def.'s Ex. 6. Ms. Wofford's testimony was echoed by defendant's brief wherein the Postal Service contends that this USPS policy makes application of the formula optional. Def.'s Post–Trial Br. at 16–18. According to defendant, instead of utilizing the formula, the policy "tells the contracting personnel to consider … available information to determine the time that added boxes really require from the supplier. The added time can then be used to assign appropriate pay for the added work." *Id.* at 17. Defendant further contends that Ms. Wofford relied on this policy and "[u]sing the information provided by [the AO], as augmented by her own inquiry and review," Ms. Wofford concluded that the additional fifty-two boxes

would increase plaintiff's compensation by $1087.56. *Id.*

The application of the formula was not optional, however. The contract is clear that the formula must be applied to "Adjustments for Route Extensions or EnRoute Boxes." Joint Ex. 1 at 15. The contract states that major service changes that exceed $2500 require the "mutual agreement of the contracting officer and the supplier" and that "[s]uch changes shall be memorialized by formal amendment to the contract." *Id.* at 54. As the court determined in its prior decision, the addition of fifty-two boxes to plaintiff's route did, in accordance with the mandatory formula, add more than $2500 to plaintiff's contract, and therefore, such a change could not be unilaterally imposed by USPS. The Postal Service was required to secure Mr. Keeter's assent prior to adding the fifty-two boxes to plaintiff's contract, and as stated in this court's prior decision:

> What the CO was *not* entitled to do, however, was to order KI to perform more than $2500 in additional work on a permanent basis without first securing plaintiff's assent. Contrary to the government's assertions, a unilateral and unfettered power to do so did not flow from the contract's provisions, and the CO's attempt to do so amounted to a breach of contract.

*Keeter,* 79 Fed.Cl. at 261. Therefore, as held in Keeter, since the contract mandated the application of the formula, Ms. Wofford was required to apply that formula to plaintiff's contract for addition of the fifty-two boxes.

The court notes that aside from the contract requirement, Ms. Wofford's assertion that the formula was optional makes no sense even under the terms of the P–5 Handbook. The P–5 Handbook is essentially a USPS "national policy" for the "operation and administration of highway contract routes box delivery service…." Def.'s Ex. 4B at 2. The handbook is distributed "directly to all areas, districts, processing and distribution centers/facilities, and administrative officials." *Id.* This means that postal officials were to be familiar with the handbook, and were on notice of all the terms and conditions contained in that handbook. The P–5 handbook, like the contract, also explicitly states that

the formula must be applied to route changes, and that major changes that exceed $2500, in accordance with the formula, cannot be unilaterally imposed without mutual agreement, or negotiation between the contracting officer and the contractor. *Id.* at 21. The handbook, in pertinent part, provides that:

212.1 Manager, Transportation Contracts Authority [10] The manager, transportation contracts, or his or her designee may order a service change that does not increase the supplier's pay by more than $2,500. All other changes must be negotiated by the manager, transportation contracts. The administrative official is not authorized to negotiate compensation or otherwise amend the contract.

. . . .

212.31 Formula to be Used

When processing extensions or en route boxes, the manager, transportation contracts, will apply the following formula. Compute adjustments in the annual hours for casing and route operations using two constant factors. Multiply the number of additional boxes by 3.64 and the additional miles by 10.4. The sum of the two equals the new hours added to the contract. For example, 10 new boxes and three additional miles are added to the route. Multiply 10 boxes by 3.64 = 36.40. Multiply 3 miles × 10.40 = 31.20. Add 36.40 + 31.20 = 67.60 to obtain the total number of additional annual hours.

Adjustments for compensation will be made by the manager, transportation contracts, to the cost worksheet pro rata.

*Id.* at 21. In accordance with the foregoing, the court can find no credibility in Ms. Wofford's testimony that she was not required to apply the formula when both the contract and the P–5 Handbook clearly contain directives to the contrary.

The policy provision that Ms. Wofford relies upon to support her asserted belief that application of the formula was not mandatory (*i.e.*, "Policy on Additional Enroute Boxes," discussed *supra*) is unavailing for two reasons. First, no policy can override mandatory contract provisions. Second, the policy itself, while arguably providing for optional use of the formula, also indicates that a unilateral change to a contract may only be made where the change does not exceed 10% of the annual rate or $2500, whichever is less.[11] Def.'s Ex. 6.

The court observes that it strains credulity that a contracting official with years of experience in that capacity would opt to accord deference to ambiguous policy announcements which, in this case appear to provide, on the one hand, that utilization of the contract formula may be optional, while simultaneously stating that where increases were greater than $2500, unilateral changes were not permitted (and required an application of the contract formula). These two competing provisions created an obvious contradiction of terms within Postal Service policy. Faced with two obviously contradictory policy provisions, Ms. Wofford chose to selectively focus on the ambiguous policy provision she preferred, while ignoring a contradictory policy provision in the P–5 handbook. Thus, in the end, she ignored the terms of a USPS policy provision, which unequivocally mandated application of the contract formula, as well as the actual contract, itself, which also mandated application of the formula.

Equally unconvincing is Ms. Wofford's testimony that she did not believe that she had to use the formula contained in Mr. Keeter's contract and in the P–5 Handbook because there was extra time in plaintiff's contract: "[I]n this case, with the extra time in the route and the postmaster saying that the supplier did not need more time because he already had that extra 30 minutes, then I

---

**10.** The P–5 Handbook describes the "Manager, Transportation Contracts" as follows: "Each manager, transportation contracts, is the only postal official authorized to enter into, execute, and approve contracts for mail transportation and related services.... The manager, transportation contracts, is, therefore, the contracting officer for box delivery HCRs and has sole authority to enter into and to negotiate adjustments to those contracts." Def.'s Ex. 4B at 10.

**11.** Mr. Rodriguez, the CO, testified that the amount of compensation for insignificant changes increased from $1000 to $2500 during the relevant time period at issue. Tr. at 370–71 (Rodriguez).

would not need to add that much time to the route." Tr. at 246 (Wofford). Yet Ms. Wofford could not point to any provision in Mr. Keeter's contract or in the P–5 Handbook that states that if plaintiff has extra time in its contract, then defendant does not have to follow the formula:

Q. Can you point to anywhere in Mr. Keeter's contract or in the P–5, anything that says that if he has too much time in his contract, you don't have to follow this formula?

A. No, I cannot.

Tr. at 210 (Wofford). The court agrees with plaintiff's argument that time is not a factor in the contract's Changes Clause. Furthermore, the Postal Service's argument that it was excused from adherence to the contract formula because plaintiff had extra time in its contract is a red herring. Defendant knew or should have known that the change to plaintiff's contract by the addition of fifty-two boxes increased KI's compensation by more than $2500. However, to avoid compliance with the contractual terms which stated that changes in excess of $2500 had to be made by mutual agreement between the contracting officer and the contractor, defendant used the time factor as a pretext. Although the AO had no real basis to assert that plaintiff had extra time, even if there had been additional time in Mr. Keeter's schedule, it should have been obvious to the contracting officials that extra time could not serve to justify USPS's actions inasmuch as the contract does not identify excess time as a basis for permitting a unilateral change.

Finally, as a separate point, but one significant in terms of plausibility, the court briefly examines Ms. Wofford's discussion of the contracting officials' rationale for giving plaintiff the second insignificant change payment for delivery to the fifty-two boxes. Neither Ms. Wofford nor the other contracting officials were ever able to counter the only logical conclusion to be drawn from defendant's second payment to plaintiff. The only credible reason for USPS to pay KI the second sum of $1607.72 was that plaintiff had been owed the formula amount for servicing the fifty-two boxes from the start. That fact, however, was a truth that the Postal Service

steadfastly refused to admit to the end, since admission meant acknowledgment that Mr. Keeter had been right all along and the Postal Service had been wrong in unilaterally ordering him to service the disputed boxes. The only explanation proffered by USPS for the second payment was a nonsensical one given by Ms. Wofford. When asked why the decision had been made to pay plaintiff the additional $1602.72, Ms. Wofford responded that "it was because we wanted to see if Mr. Keeter would go ahead and deliver the boxes." Tr. at 239 (Wofford). Implicit in Ms. Wofford's response was a refusal to acknowledge owing that money to plaintiff because, according to USPS, he had already been paid the appropriate amount, *i.e.*, $1087.56. Ms. Wofford's testimony, instead, suggests that defendant was giving the money to Mr. Keeter just to see if he would follow through on his pre-existing obligation to deliver the boxes.

■ The court can accord no credence to Ms. Wofford's testimony in this regard. If, at the end of the day, USPS contracting officials believed that the original $1087.56 was payment in full for the fifty-two boxes and that the Postal Service was ultimately under no obligation to pay the additional $1602.72, Ms. Wofford and her supervisor, Mr. McCague, would not have given the second payment to Mr. Keeter. To have done so for the reason stated is wholly illogical and more importantly, under well-established precedent, government contract officials cannot simply give a contractor additional money if it is not owed to the contractor. There must be some form of *quid pro quo* or, in government procurement parlance, there must be consideration. Numerous decisions of this court's predecessor, the United States Court of Claims, have echoed the above principle—that a contract modification must be supported by consideration. A lack of consideration will render the contract modification void, or without force or effect. *See Vulcanite Portland Cement Co. v. United States*, 74 Ct.Cl. 692, 705 (1931) ("It is equally well settled that where the provisions of a contract are changed by a subsequent agreement between the same parties such agreement has no force and effect unless there is

some consideration moving to the party adversely affected by such changes."). The performance of a pre-existing legal duty is not consideration, *American Red Ball Int'l, Inc. v. United States,* 79 Fed.Cl. 474, 478 (2007) (citing *Allen v. United States,* 100 F.3d 133, 134 (Fed.Cir.1996)) (other citation omitted), and in the absence of express authority to do so, a government official may not pay gratuities for the performance of contractual duties which the contractor is obligated to perform. *See Burke & James v. United States,* 63 Ct.Cl. 36, 57 (1927).

Thus, in the present case, despite the Postal Service's refusal to acknowledge the obvious, the government's action in paying the second amount reflects the fact that USPS contracting officials ultimately were aware that defendant owed plaintiff the formula amount for servicing the fifty-two boxes and acted on that knowledge. It reflects poorly on the Postal Service that regardless of this awareness, Ms. Wofford and the other USPS contracting officials then continued in a campaign to wrongfully force KI to accept a unilateral change which the contract dictated was to be negotiated.

Based on the foregoing, the court finds that Ms. Wofford acted in bad faith when she disregarded the clear language of the contract that unequivocally stated that the formula had to be applied to calculate route changes and when she unilaterally directed plaintiff to service the fifty-two boxes. Despite Ms. Wofford's twenty-eight years of experience as a postal office employee, her years of experience as a contract specialist, and her extensive experience with contracts like Mr. Keeter's, she chose to rely on the AO's representations rather than exercising her own independent judgment. It is the court's finding that Ms. Wofford's actions contributed to a concerted campaign to deprive plaintiff of its contractual rights.

### B. Mr. Mark McCague

Mr. McCague was the senior contract specialist during the course of these events. He joined the USPS in 1977, and became a contract specialist in 1996. In January 2003, Mr. McCague was promoted to senior specialist, and during the matters at issue in this case, he was Ms. Wofford's supervisor. Tr. at 279 (McCague).

The evidence of record shows that Mr. McCague, like Ms. Wofford, relied unduly on the AO's representations regarding the change to Mr. Keeter's contract. When Mr. McCague was asked whether he agreed with the method by which Ms. Wofford made the change to plaintiff's contract, Mr. McCague testified that the change was made in accordance with the contract. Tr. at 283 (McCague). However, Mr. McCague also testified that the contract formula was not applied because "[i]t was not recommended by the administrative official." *Id.* The record further reveals that Mr. McCague made this very same point in his deposition testimony:

Q. If 52 boxes are going to be added to a route, how is the increase in compensation calculated?

A. In this particular case, we took the documents that the postmaster submitted as valid requirements and implemented them.

Tr. at 288–89 (McCague). The court cannot understand how a senior contracting specialist with many years of experience at the USPS could rely on the recommendations of an employee with no contracting authority whatsoever in determining whether a contract provision did or did not apply in a contractual context. Mr. McCague exercised no independent judgment in this matter but, like Ms. Wofford, merely relied on the AO's recommendations and on the documents submitted by the AO which stated that plaintiff had extra time in his contract, such that no additional time was required for servicing the fifty-two boxes.

Demonstrative of Mr. McCague's attitude toward plaintiff is the fact that Mr. McCague testified that in addition to plaintiff, there were other contractors whose grievances he requested be submitted in writing. However, Mr. McCague had never forbidden the use of a lawyer except in plaintiff's case. When asked why he had imposed this restriction on Mr. Keeter, Mr. McCague was unable to offer any legitimate reason, only "I just wanted it in his handwriting to see what his grievances were." Tr. at 299 (McCague). Mr. McCague took this position despite Mr.

Keeter's repeated pleas asking both Ms. Wofford and Mr. McCague to treat him in accordance with his contract. Tr. at 71–72, 74–75, 79 (Keeter). Not only was such treatment not forthcoming, but when Mr. Keeter complained that Postmaster Orr had told him that what he thought did not matter, Mr. McCague's response was that she was right, what Mr. Keeter thought did not matter. Tr. at 72 (Keeter).

In an effort to justify his actions, after the fact, Mr. McCague was adamant that post office policy does not require mandatory application of the contract formula. Mr. McCague testified that the formula "was merely a guideline," and that "[t]hrough the years of training and talking to people in the office, the formula was not mandatory." Tr. at 294 (McCague). The court finds that like Ms. Wofford, Mr. McCague misses the mark. Postal Service policies did not control here. The disputed formula was a part of the contract, and under well-established contract principles, the parties were required to comply with all bargained-for contractual terms. Here, the contracting officials, including Mr. McCague, decided to ignore an inconvenient contractual provision because it no longer benefitted the Postal Service's interests, despite a contractual obligation to apply the formula and despite an obligation to negotiate with plaintiff. As was the case with Ms. Wofford, Mr. McCague also abdicated his contractual responsibilities, inappropriately relied on the AO, and took an unreasonable position with regard to plaintiff's grievance. Accordingly, the court finds that Mr. McCague acted to deprive plaintiff of its bargained-for contractual rights.

### C. Mr. Eracio Rodriguez

Mr. Rodriguez was the Manager, Transportation Contracts (MTC), or Contracting Officer (CO) of the DNO in Dallas, Texas, and has been employed by USPS since 1977. He became a contracting specialist in 1990, and was promoted to CO at the DNO in November 2002. Mr. Rodriguez was the CO for the HCR contracts, like Mr. Keeter's, operating in Texas, Arkansas, Oklahoma, Louisiana, and New Mexico.

Although Mr. Rodriguez was the CO during the events in this case, his only involvement with these matters case revolved around the issuance of the contract termination and denial of plaintiff's claim. Pl.'s Ex. 19; Tr. at 341 (Rodriguez). In fact, Mr. Rodriguez testified that he had no specific recollection of any involvement on his part until he signed the USPS decision denying plaintiff's claim on April 28, 2004 and USPS termination of plaintiff's contract for default on that same date. Tr. at 341–42; Pl.'s Ex. 19. Mr. Rodriguez stated that while he would have been "kept informed" about plaintiff's case, he recalled none of the details. Tr. at 341–42 (Rodriguez). Mr. Rodriguez further testified that he was responsible for approximately 2,280 contracts in early 2004 and therefore, he placed great reliance upon his staff to accurately report to him and to assist him.

Mr. Rodriguez's testimony at trial, for the most part, centered around his reliance upon his staff and most specifically, upon Mr. McCague, to advise him about the KI contract. It is clear that he was not actively involved in this contract dispute during the period when any actions were taken or decisions were made prior to the final determinations Mr. Rodriguez issued in April 2004. Mr. Rodriguez's court testimony, rather, centered largely on hypothetical questions posed to him as opposed to questions about any personal involvement he might have had in this matter. Through his responses to hypotheticals, and in reliance upon USPS policy provisions, Mr. Rodriguez maintained the original USPS position that the contract formula did not have to be applied in the circumstances of this case. Tr. at 352 (Rodriguez).

Mr. Rodriguez's testimony, like that of the other contracting officials, reveals that he, too, relied on the AO's representations and recommendations regarding the changes to KI's contract:

Well, good faith to us was that we were looking at this document [Policy on Additional Enroute Boxes] and although, as you stated, the numbers changed, the policy did not. So we're looking at a supplier—box delivery route which had additional

hours, had more time in it than we needed to add to it. In the context of adding 52 boxes, that was an in-line adjustment. So the specialist, by the recommendation of the administrative official, which is our eyes and ears out in the rural area, stated that this is the time that we need to add to the contract. By design, we're looking at what does it take to deliver this mail. Tr. at 372 (Rodriguez). Thus, Mr. Rodriguez, using the same rationale as Ms. Wofford and Mr. McCague, ignored the terms of the contract and likewise gave his stamp of approval to allowing the AO to determine the Postal Service's response to plaintiff.

Mr. Rodriguez's focus in discussing the matters that transpired was primarily upon serving the best interests of the Postal Service and its customers. When queried about his reaction to a carrier such as KI who refused to deliver the mail, Mr. Rodriguez responded:

Q. Without regard to why he didn't want to do it, whatever his reason, it's not part of my contract—do you know what you would have done then?

A. Yes.

Q. What would you have done?

A. Given the case that we got to an impasse, a point where he states to me specifically that he is not going to do this work, I would move to a termination for convenience.

. . . .

A. My own opinion is that I cannot have a supplier telling me that they're not going to provide service of requirements that I present them with.

Q. Who—I am sorry.

A. The contract specifically gives us the opportunity to change service because of the needs of the service for growth, new people coming into the community and so forth. So in this case, with box delivery, we have to get the service to the customer. So I would not yield in moving to a T for C, or termination for convenience, if I cannot get the supplier to do the work.

Q. Who decides what the needs of the Postal Office are, in a general way?

A. The administrative official.

Tr. at 357–59 (Rodriguez). While the court is cognizant of the fact that the CO and the Postal Service must place a very high priority on the efficiency of the agency and service to its customers, those interests may not override the contractual obligations into which defendant has entered with its supplier or carrier.

What Mr. Rodriguez consistently failed to acknowledge in his testimony concerning the Postal Service's obligation to make necessary changes, was an equal need to abide by the terms of the contract. During his testimony, Mr. Rodriguez never acknowledged the fact that even if the Postal Service's needs changed, it could not unilaterally enlarge the scope of plaintiff's work if the contract mandated that such a change had to be mutually agreed upon. To that end, Mr. Rodriguez testified as follows:

Q. You've had an opportunity to listen to the testimony of all of the witnesses. Would it be fair to say that even today, it's the position of the United States Postal Service that we came up with a change and whether it was in agreement with Mr. Keeter's contract or not, he was going to do it or we were going to get rid of him?

A. Is that a fair statement to say?

Q. Yes.

A. Yes.

Tr. at 375 (Rodriguez). The foregoing testimony by Mr. Rodriguez highlights a fundamental unwillingness on the part of the Postal Service's CO to acknowledge an obligation on the part of USPS to make a good faith effort to negotiate a major change with plaintiff as required by the terms of the contract. The CO's stated position in that regard was that if plaintiff refused the change that USPS wanted, the CO would "get rid of him." *Id.* Such an attitude from the CO was clearly reflected in the Postal Service's unfair treatment of Mr. Keeter in this case.

Furthermore, contrary to the CO's declarations that a termination of the contract for the convenience of the government was the appropriate measure to be taken in the event of an impasse between USPS and a carrier,

such an action was exactly what the CO and the Postal Service chose not to take. Here, instead of following the path which Mr. Rodriguez described as the action he would take if an impasse were to be reached (*i.e.*, termination for the convenience of the government), Mr. Rodriguez issued plaintiff a termination for default on behalf of the Postal Service.

Based on the foregoing, Mr. Rodriguez, as the Postal Service's CO, like his subordinate contracting officials before him, improperly relied upon the AO's recommendations instead of following the provisions of the contract. In his particular case, it appears that Mr. Rodriguez relied more so upon Mr. McCague, who, in turn, relied on Postmaster Orr. Mr. Rodriguez failed to exercise independent judgment and failed to call to task Ms. Wofford and Mr. McCague, his subordinate contracting officials, for their failure to perform their duties with respect to the contract. While, as Mr. Rodriguez testified, the AO may indeed be the USPS official who generally decides the needs of the Postal Service, the responsibility fell upon Mr. Rodriguez and his contracting officials to carry out the terms of the USPS contract with KI. This Mr. Rodriguez failed to do, and in that failure, Mr. Rodriguez chose to penalize plaintiff for insisting on its contractual rights by wrongfully terminating plaintiff's contract for default. Accordingly, Mr. Rodriguez's actions intentionally deprived plaintiff of its bargained-for contractual rights in this case.

## IV. Evidence of Clear Intent to Deprive Plaintiff of Its Contractual Rights

██ This court is convinced, based on the record as a whole, that the AO and the contracting officials acted in bad faith in the administration of KI's contract. The court finds that the AO and contracting officials interfered with plaintiff's performance of the contract, with a specific intent to deprive plaintiff of its contractual rights. Despite plaintiff's repeated protestations to the AO and to the contracting officials that the route change was contrary to controlling contract provisions, KI's complaints were ignored and the USPS engaged in a concerted effort to force plaintiff to acquiesce to its demands.

"The actions of these [postal] officials far exceeded the strict insistence on contract compliance" and instead evolved into a plan designed to get rid of plaintiff when plaintiff refused to comply with the Postal Service's wishes. *See North Star*, 76 Fed.Cl. at 211.

The actions of these USPS officials, as shown above, were severe enough to eventually force plaintiff to abandon his contract. Mr. Keeter testified that he truly felt the impact of the postal officials' actions when they deducted a third of his salary as reprocurement costs for Postmaster Orr's delivery of the mail to the disputed fifty-two boxes:

Q. Why turn in the keys?

A. Well, I knew with them taking $1093, that's a third of my gross pay, $3069 for a four-week period, there's no way I could continue running that route.

Q. Now when you say gross pay, that's the gross income that Keeter Trading—

A. Yes.

Q. Could Keeter Trading operate with that type of loss?

A. No, it could not.

Tr. at 76–77 (Keeter); Pl.'s Ex. 17 (stating that plaintiff is leaving his service route because of the high reprocurement costs that defendant was deducting from his pay). The record shows that defendant eventually calculated reprocurement costs against Mr. Keeter in the amount of $1342.69, excluding administrative costs, for Postmaster Orr's delivery of the fifty-two boxes for approximately a month. Pl.'s Ex. at 20; Tr. at 107–08 (Keeter). Mr. Keeter, under the contract, was paid $3069.00 per month. Tr. at 76 (Keeter). By deducting $1342.69 out of plaintiff's pay for reprocurement costs, defendant, as Mr. Keeter claims, was taking approximately a third of plaintiff's gross pay, thus, in effect, forcing plaintiff to abandon his route as a result of this sizeable pay cut.

In accordance with the foregoing analysis, it is the court's determination that the "cumulative and pernicious impact of these individual acts of bad faith exceeded their individual weight, leading the court to conclude that, collectively, the conduct of the governmental actors who dealt with [Mr. Keeter]

fell far below the standard of good faith that is integral to the Federal procurement system." *North Star*, 76 Fed.Cl. at 212. Accordingly, in the opinion of the court, the AO and contracting officials collectively acted in bad faith with the specific intent to deprive plaintiff of its bargained-for contractual rights.

### CONCLUSION

For the foregoing reasons, the court finds that the Postal Service terminated plaintiff's contract in bad faith. In particular, the court finds that the AO and the contracting officials interfered with plaintiff's performance so as to destroy his reasonable expectations regarding the fruits of the contract.

Accordingly, it is hereby **ORDERED** that:

(1) Plaintiff shall be **AWARDED** breach of contract damages in the amount of $42,641.24;

(2) The Clerk is directed to **ENTER** final judgment for plaintiff in the amount of $42,641.24, plus interest pursuant to 41 U.S.C. § 611 (2000); and

(3) No costs.